FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

99 FEB 3 PM 3:09

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| PECK'S PETROLEUM, INC., | ) CASE NO. 97-42013-JSS-13 |
| EIN NO. 63-0990240 | ) |
| | ) CHAPTER 11 |
| Debtor. | ) |
| | ) |
| FIRST AMERICAN TITLE INSURANCE CO., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) DISTRICT COURT CASE NO. |
| | ) CV-98-PT-666 E |
| PECK'S PETROLEUM, INC., et al., | ) |
| Defendants. | ) |
| | ) |
| PECK'S PETROLEUM, INC. and PEGGY CONN, | ) |
| | ) |
| Counterclaim Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| NATIONAL REFINING COMPANY, | ) |
| | ) |
| Counterclaim Defendant. | ) |
| | ) |
| PECK'S PETROLEUM, INC. and PEGGY CONN, | ) |
| | ) |
| Third Party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| VERNON YOUNG, | ) |
| | ) |
| Third Party Defendant. | ) |

ENTERED

FEB 3 1999

UPO



## MEMORANDUM OPINION

This cause comes to be heard on First American Title Insurance Company's Motion for Summary Judgment filed in this case on January 5, 1998 and renewed on September 4, 1998, the renewed Motion to Dismiss filed by National Refining Company and Vernon Young on January 23, 1998, which was treated as a motion for summary judgment by the Bankruptcy Court and which was renewed by NRC and Young on September 10, 1998, and the Motion for Summary Judgment filed by Peck Petroleum and Peggy Ann Conn on January 22, 1998, and apparently renewed on or about November 24, 1998.

### I. Factual Background and Summary of the Claims

San Ann Service, Inc. was incorporated in 1955 by Peggy Ann Conn's father, Peck Scott, to own operate and lease gas stations. In 1989 or 1990, San Ann Service, Inc., San Ann Tobacco, Inc., San Ann Premium Center, Inc., H.K. Scott, Inc., and Peck's Petroleum were merged into a single corporation, Peck's Petroleum ("Peck's"). Peck's still does business in some locations under the trade name San Ann. Peggy Ann Conn ("Conn") is the current president of Peck's and has held that position since 1990. Prior to 1990, Conn worked for San Ann Service and San Ann Tobacco. As president of Peck's, Conn has run the office and controlled the business. Conn's duties and responsibilities have included dealing with the financial condition of the company and evaluating the cash flows and sales of the eight different service stations owned or leased by Peck's.

On January 12, 1989, Peck's Petroleum, Inc., as mortgagor, and San Ann Tobacco, Inc., as borrower, executed a real estate mortgage not to exceed the sum of $250,000.00 in favor of the First Bank of Boaz ("First Bank"). The mortgage was recorded at Real 3541, Page 970 in the Office of the Judge of Probate of Jefferson County on January 24, 1989 and encumbered a parcel of real estate described as "Lot 1, Block 10, according to the survey of Avondale site C, and recorded in Map Book 55, Page 50, in the Office of the Judge of Probate of Jefferson County, Alabama." A service station is located on the above described property (hereinafter referred to as "the Birmingham Property").

Conn admits to knowing that Peck's and its predecessors owed an indebtedness to First Bank before she became president of the company and to discussing the indebtedness with her father prior to his death in 1991. She was also aware that the station(s) owned and leased by Peck's served as collateral on debt(s) to First

Bank. Conn has, in the past, obtained releases from First Bank to sell other pieces of real estate owned by Peck's.

Since 1990, Peck's, through Conn, had desired to sell the Birmingham Property in an attempt to alleviate the company's financial difficulties and had undertaken conversations with Ricky Ray of First Bank about the possibility of selling some of Peck's properties in order to reduce its debt to First Bank. In August of 1996, Peck's, through Conn, requested and received from First Bank a release price for which it could sell the Birmingham Property free and clear of the mortgage. First Bank wrote a letter to Peck's stating that the bank would release the Birmingham Property upon receipt of a principal payment of $150,000.00.

During the summer of 1996, Conn, on behalf of Peck's, began discussing the possibility of selling the Birmingham Property with Vernon and Millard Young, as representatives of National Refining Company ("NRC"). According to Peck's and Conn, the Youngs, either through NRC or some other entity, provided Peck's with wholesale gasoline and were familiar with Peck's operation. Conn alleges that the Youngs were so familiar with Peck's operations that they knew of the mortgage obligation owed by Peck's to First Bank and knew that the mortgage was secured by real property. Conn further alleges that, sometime after an agreement had been reached regarding the sale of the property, Vernon Young called her and informed her that a title search had revealed that First Bank did not have a lien on the Birmingham Property. Conn claims that she then told Young to look into the matter further, as she thought he was mistaken. According to Conn, Young, following the first conversation, again called and told her that First bank did not have a mortgage on the property. Conn alleges that Young, during the follow-up conversation, told her that an investigation had revealed a mortgage under which Peck's was mortgagor and San Ann Tobacco was mortgagee.

On April 9, 1997, Peck's entered into a contract to sell the Birmingham Property to NRC. In March of 1997, in preparation for and prior to the closing between Peck's and NRC, James Campbell, NRC's attorney, contacted Cahaba Title, an agent for First American Title Insurance Company ("FATI"), and requested that the company issue a title commitment and, later, a policy as to the Birmingham Property with NRC as the insured. FATI, through Cahaba Title, issued a title commitment effective March 11, 1997. The title commitment contained an exception to coverage on Schedule B, Part I, which provided as follows:

> 4. Mortgage from Peck's Petroleum, Inc. to San Ann Tobacco, Inc., in the amount of $250,000.00 dated January 12, 1989, and recorded in Real 3541 page 970 to be paid and properly satisfied.

At closing, Peggy Conn, allegedly at the request of and based upon the information provided by NRC and Young, executed an affidavit which stated:

> My name is Peggy Scott Conn. I am over the age of twenty-one years and a resident of Marshall County, Alabama. The substance of this statement is based upon first-hand and personal information.
>
> I am President of Peck's Petroleum, Inc. d/b/a San Ann Service, a successor corporation of San Ann Service, Inc. San Ann Tobacco, Inc., and HK Scott, Inc. On January 12, 1989, Peck's Petroleum, Inc. became indebted to San Ann Tobacco, Inc., in the principal amount of Two hundred fifty [thousand] ($250,000.00) dollars. This debt was secured by a mortgage of even date on the following described property, to wit:
>
>> Lot 1, Block 10, according to the survey of Avondale site C, and recorded in Map Book 55, Page 50, in the Office of the Judge of Probate of Jefferson County, Alabama.
>
> Said mortgage is recorded in the Office of the Judge of Probate, Jefferson County, Alabama, at Book 3541, Page 970.
>
> In December, 1989, San Ann Service, Inc., San Ann Tobacco, Inc., and HK Scott, Inc. were merged with Peck's Petroleum, Inc. At the time of the said merger, fee simple title to the premises merged into Peck's Petroleum, Inc. and eliminated the underlying debt.

Despite the assertions in Conn's affidavit, there was no mortgage between Peck's and San Ann Tobacco, Inc. Rather, as stated above, First Bank was the mortgagee as to said property.

In addition to executing the affidavit at the closing, Conn also executed a document purporting to be a "Full Satisfaction of Recorded Lien." The document states:

> KNOW ALL MEN BY THESE PRESENTS, That PECK'S PETROLEUM, INC., as successor corporation to San Ann Tobacco, Inc., (see attached affidavit) acknowledges full payment of the indebtedness secured by that certain mortgage executed by Peck's Petroleum, Inc. to San Ann Tobacco, Inc., on January 12, 1989, which said mortgage was recorded in the Office of the Probate Judge of Jefferson County, Alabama, . . . and does further hereby release and satisfy said mortgage.

On April 9, 1997, Conn, as President of Peck's, executed a General Warranty Deed conveying the Birmingham Property to NRC for a purchase price of $350,000.00. Consequentially, Mr. Campbell, as attorney for NRC, closed the transaction and disbursed all of the proceeds from the sale to Peck's and Conn. As part of the transaction, NRC withheld $139,719.27 of the property's purchase price as payment of Peck's past-due gasoline account. According to Conn, of the approximately $208,000.00 in proceeds received by Peck's as a result of the sale, Peck's paid First Bank a total of $48,750.00 to bring the company's payments on the mortgage current. The remainder of the proceeds were used to cover gasoline costs, past-due rents, and attorney's fees. Peck's did not pay off the remainder of the mortgage.

On August 28, 1997, FATI and NRC filed a complaint against Conn and Peck's in the Circuit Court

of Marshall County. The case was subsequently removed to this court. On October 16, 1997, Peck's and Conn filed a counterclaim against NRC and a third party claim against Vernon Young. On March 9, 1998, the Bankruptcy Court entered an order granting partial summary judgment in favor of NRC and Young, and dismissed Peck's and Conn's negligence claims against FATI, NRC and Young. The Bankruptcy Court granted summary judgment in favor of NRC and Young against Peck's on the breach of covenants of title and breach of warranty of title claims, but held that damages on the claim were unclear and should be established at trial. The Bankruptcy Court granted Conn's motion for summary judgment on the breach of warranty and encumbrances claims against her individually, finding that the representations made in the deed were made by Peck's, and not by Conn in her individual capacity. Additionally, the court denied NRC and Young's Motion for Summary Judgment as to the fraud claims raised by Peck's and Conn.

Currently pending before this court are the following:

(1) FATI's Motion for Summary Judgment filed in this case on January 5, 1998 and renewed on September 4, 1998;

(2) The renewed Motion to Dismiss filed by NRC and Vernon Young on January 23, 1998, which was treated as a motion for summary judgment by the Bankruptcy Court and which was renewed by NRC and Young on September 10, 1998; and

(3) The Motion for Summary Judgment filed by Peck's and Conn on January 22, 1998, and apparently renewed on or about November 24, 1998.

The issues addressed by the motions are limited to the following:

(1) Whether or not the court should grant summary judgment in favor of FATI, NRC and Young on Peck's and Conn's misrepresentation and deceit claims against them;

(2) Whether the court should reconsider the granting of summary judgment in favor of NRC/FATI on the breach of warranty and encumbrances claim and, if not, the amount of damages which NRC/FATI is entitled to on its claims; and

(3) Whether the court should grant summary judgment in favor of either side on the fraud claim of FATI, NRC and Young against Peck's and Conn.

The court will address the issues in the order presented above.

## H. Fraud Claims Against Young and NRC

Peck's and Conn have brought claims for misrepresentation and deceit against FATI, NRC and Young arising out of NRC's purchase of the Birmingham Property from Peck's. Specifically, Peck's and Conn allege that NRC, through Young, misrepresented to Conn that there was no mortgage on the Birmingham Property between First Bank and Peck's, that NRC and Young "had no reasonable grounds for believing said assertion to be true," and that in reliance on said misrepresentations, Conn completed an affidavit and executed a satisfaction which purported to satisfy a mortgage between Peck's and San Ann Tobacco. Peck's and Conn's fraud claim against FATI, NRC and Young is thus based on the allegation that NRC and Young misrepresented to Peck's and Conn the status of a mortgage on property that *Peck's* owned and that Conn executed an affidavit in reliance on that misrepresentation. Peck's and Conn maintain that NRC was motivated to misrepresent the status of the mortgage because, as a result of the sale, NRC received nearly $140,000 in payment of Peck's past due account.

FATI, NRC and Young maintain that they never misrepresented the status of the mortgage on the property and that even had they done so, Peck's and Conn could not reasonably have relied upon such statements. Thus, FATI, NRC and Young now seek summary judgment on Peck's and Conn's misrepresentation and deceit claims.

In Alabama, the elements of misrepresentation are: (1) a misrepresentation of a material fact made willfully to deceive, recklessly, without knowledge, or mistakenly; (2) which was reasonably relied upon[1]; and

---

[1] Prior to March of 1997, Alabama courts adhered to a "justifiable reliance" standard, which held that "A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully understand the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth." [cite] The Alabama Supreme Court officially overruled the use of such a standard in favor of "reasonable reliance" in Foremost Ins. Co. v. Parham, 693 So.2d 401 (Ala. 1997). In Foremost, the Alabama Supreme Court stated that:

> "[t]he 'reasonable reliance' standard is, in our view, a more practicable standard that will allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties. In addition, a return to the 'reasonable reliance' standard will once again provide a mechanism, which was available before Hickox, whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.

Id. at 421.

(3) which was the proximate cause of damage to the claimant. McGriff v. Missesota Mutual Life Ins. Co., 127 F.3d 1410 (11th Cir. 1997)(utilizing Alabama standard for fraudulent inducement); Pinyan v. Community Bank, 644 So.2d 919 (Ala. 1994); McCullough v. McAnalley, 590 So.2d 229 (Ala. 1991).

     Conn claims in her deposition testimony that she was misled by NRC and Young in that Vernon Young convinced her, despite her knowledge to the contrary, that there existed no mortgage on the Birmingham Property between Peck's and First Bank. Conn also maintains that the Youngs were familiar enough with Peck's business to know of the mortgage. FATI, NRC and Young deny having made any representations concerning the condition of title to the Birmingham Property. They also deny having any knowledge whatsoever of the mortgage to First Bank. However, assuming, *arguendo*, that plaintiffs could show that the either FATI or the Youngs misrepresented the condition of title to the Birmingham Property and that such misrepresentation was done willfully to deceive, recklessly, without knowledge or mistakenly, Peck's and Conn, according to FATI, NRC and Young, cannot show that they reasonably relied upon such misrepresentation. Conn's deposition testimony explicitly indicates that she knew of the mortgage, discussed the mortgage on several occasions with Ricky Ray, an employee of First Bank, and, in 1996, requested and received a release price for which Peck's could sell the Birmingham Property free and clear of the mortgage. Further, following the closing of the sale, Peck's applied $48,750 of the proceeds from the sale of the Birmingham Property to the debt in order to bring the payments on the note up to date, indicating that Peck's knew of the mortgage. Finally, the mortgage to First Bank was publicly recorded. If Conn or Peck's had any doubts about the status of the note, a title search would have indicated that the mortgage continued to exist.[2] Alabama courts have held that "[w]here one has knowledge of the falsity of a representation or even reason to doubt the truth of a representation . . . reliance is not reasonable." See Patterson v. United Companies Lending Corp., 4 F.Supp.2d 1349 (M.D. Ala. 1998); Ramsay Health Care, Inc. v. Follmer, 560 So.2d 746, 748 (Ala.1990); Guillot v. Beltone Electronics Corp., 540 So.2d 648, 649 (Ala.1988); Taylor v. Moorman Manufacturing Co., 475 So.2d 1187, 1189 (Ala.1985); Bedwell Lumber Co., Inc. v. T & T Corp., 386 So.2d 413, 415 (Ala.1980). FATI, NRC and Young contend that Peck's and Conn, at the very least, had substantial reason to doubt the veracity

---

     [2] Even if the merger between Peck's and the San Ann entities had caused some confusion regarding the proper name of the mortgagor, Peck's would have been in the best position to investigate whether or not the mortgage was still in effect. Peck's senior officers could not have reasonably relied on the claims of those not associated with the operation of the business and could not have been reasonably convinced by such outsiders that the mortgage did not exist.

of any alleged misrepresentation made by Vernon Young or any other person associated with FATI or NRC.

NRC and Young also argue that because a purchaser of real property does not owe a duty to the seller to conduct a title search and because a plaintiff cannot maintain an action for fraud without a breach of a legal duty owed by a defendant to the plaintiff, Peck's and Conn cannot, as a matter of law, maintain an action for fraud against them. See Colonial Bank of Alabama v. Ridley & Schwiegert, 551 So.2d 390 ( Ala. 1989); Lawyer's Title Ins. Co. v. Vella, 570 So.2d 578 (Ala. 1990); Dixon v. Moore, 468 So.2d 136 (Ala. 1985). Peck's and Conn acknowledge that NRC and Young had no affirmative duty to conduct a title search. However, Peck's and Conn argue that the absence of a duty to conduct a title search does not necessarily lead to the conclusion that NRC and Young did not have a duty to be truthful in making representations about the condition of title to the Birmingham Property. Both parties point to a passage from Colonial Bank, *supra*, stating "[t]here is a duty not to make a false representation to those whom a defendant intends, for his own purposes, to reach and influence by the representation." Colonial Bank, 551 So.2d 390. Although NRC and Young go on to deny that they had any duty to Peck's and Conn under this standard, Peck's and Conn suggest that the passage clearly establishes a duty on the part of defendants to refrain from making false statements in an effort to induce the sale.

### III. FATI and NRC's Breach of Warranty and Encumbrances Claims Against Peck's

Peck's acknowledges that a mortgage to First Bank was a valid lien on the Birmingham Property at the time the deed to the property was executed. Peck's also acknowledges that the deed delivered by Peck's to NRC contains a covenant against encumbrance. Peck's thus admits to having breached the covenant upon execution of the deed. However, Peck's asserts an affirmative defense, contending that FATI and NRC are equitably estopped from recovering against Peck's as a result of FATI and NRC's misrepresentations regarding the status of the mortgage. Peck's, in support of its contention, points to Mazer v. Jackson Ins. Agency, 340 So.2d 770 (Ala. 1984), in which the Alabama Supreme Court stated that "[t]he purpose of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience." Peck's claims that, because FATI and NRC (allegedly) do not come to the table with clean hands, they can receive no relief under cases like Mazer and Foy v. Foy, 447 So.2d 158 (Ala. 1984). Peck's thus moves to set aside the judgment of the Bankruptcy Court.

NRC, in response to Peck's renewed motion, asserts that, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Peck's had ten days from the date of judgment to move to amend or alter the judgment rendered by the Bankruptcy Court on March 9, 1998. Peck's did not file its renewed motion until more than nine months after the judgment was entered. NRC thus contends that Peck's renewed motion is untimely.

NRC notes that the renewed motion marks the first time that Peck's has argued that NRC is equitably estopped from recovering on the breach of warranty and encumbrances claim. NRC also points out that the Alabama Supreme Court has held that notice or knowledge of an encumbrance on the part of the buyer "does not impair the right of recovery upon covenants of warranty. The covenants are taken for protection and indemnity against known and unknown encumbrances or defects of title." Copeland v. McAdory, 13 So. 545 (1893). NRC further contends that, given the evidence discussed above in reference to Peck's claims against FATI, NRC and Young, Peck's could not reasonably have relied on any alleged misrepresentations. The doctrine of unclean hands, according to NRC, is simply inapplicable to this situation, in that any misrepresentations made could not have had any real influence on the transaction given Peck's and Conn's admitted knowledge of the circumstances surrounding the mortgage.

NRC and FATI thus contend that the Bankruptcy Court was correct in granting summary judgment to NRC on the breach of warranty claim. Because FATI has now paid off the mortgage to First Bank, NRC claims that summary judgment as to the damages on the claim is now proper.

A. **Damages for Breach of Covenants of Title and Warranty Claims**

According to FATI and NRC, although the damages due to them as a result of Peck's breach of covenants of title and breach of warranty may have been undetermined when summary judgment was first granted in this case, such damages have now been determined. According to the affidavit of William V. Dillard, State Counsel for First American Title Insurance Company, FATI was required to pay the total sum of $225,845.96 to defend the title of NRC to the Birmingham Property. The figure represents the amount owed on First Bank's mortgage on the Birmingham Property. Based on Mr. Dillard's affidavit, FATI contends that there now exists no genuine issue of material fact as to the breach of warranty of no encumbrances claims. Peck's has provided no evidence on the issue of how much damages FATI should recover as a result of its payout to First Bank.

### IV. FATI, NRC and Young's Fraud Claims Against Peck's and Conn

FATI, NRC and Young contend that summary judgment is due to be granted on their fraud claims against both Peck's and Conn.[3] Pointing to the standard set out in McGriff and Pinyan, above, FATI, NRC and Young claim to have established the existence of: (1) a misrepresentation of a material fact made willfully to deceive, recklessly, without knowledge, or mistakenly; (2) which was reasonably relied upon; and (3) which was the proximate cause of damage to the claimant.

In Peck's and Conn's Brief in Support of their Renewed Motion for Summary Judgment, Peck's and Conn "concede that they made a false statement of an existing fact to NRC" when Conn executed the affidavit and satisfaction. Conn's testimony further indicates that she clearly knew of the existence of the mortgage and that Peck's, immediately after the completion of the transaction, in recognition of the mortgage, paid $48,750 to First Bank to bring the payments on the mortgage current. Such actions, according to FATI, NRC and Young, clearly show that the misrepresentation was made willfully to deceive, or, at a minimum, recklessly. Both FATI and NRC and Young claim to have reasonably relied on the misrepresentations made by Peck's and Conn in the affidavit and satisfaction and, of course, that they were injured by the misrepresentations. Vernon Young claims in his affidavit testimony that NRC would not have closed on the property if not for the closing affidavit. Similarly, William Dillard's affidavit testimony indicates that FATI would not have entered into the transaction without the affidavit.

Peck's and Conn argue that FATI, NRC and Young did not rely on Conn's assertions, but, as stated

---

[3] Note that FATI, NRC and Young seek to hold Conn liable both as a representative of Peck's and as an individual for the misrepresentations she made in the affidavit and satisfaction. The Alabama Supreme Court has held that "[i]n order to hold an officer of a corporation liable for the negligent or wrongful acts of the corporation, there must have been upon his part such a breach of duty as contributed to, or helped bring about, the injury; that is to say, he must be a participant in the wrongful act." Crigler v. Salac, 438 So.2d 1375 (Ala. 1983). The Crigler court also stated that:
> It is well-established that a director of a corporation may not participate in a tort perpetrated through the agency of a corporation, or in a fraudulent injury to another, without being civilly responsible (citations omitted)... It is thoroughly well settled that a man is personally liable for all torts committed by him, consisting in misfeasance – as fraud, conversion, acts done negligently, etc. – notwithstanding he may have acted as the agent or under directions of another. And this is true to the full extent as to torts committed by the officers or agents of a corporation in the management of its affairs. The fact that the circumstances are such as to render the corporation liable is altogether immaterial... Corporate officers are liable for their torts, although committed when acting officially.

Crigler, 438 So.2d at 1380.

above, that Vernon Young induced the assertions in order to close the deal. Peck's and Conn claim that NRC and Young were advised of the mortgage, but that Young then convinced Conn that no such mortgage existed and then required Peck's and Conn to produce the affidavit and satisfaction "in order to buttress this delusion." Based on this rendition of the facts, Peck's and Conn argue that FATI, NRC and Young cannot maintain an action for fraud because "[t]he person relying on a representation must believe the fact to be true and his reliance must be reasonable under the circumstances to be actionable under the Alabama fraud statute . . . and if a person has reason to doubt the truth of a representation or is informed of the truth before he acts, he has no right to act on it." Kaye v. Pawnee Const. Co., 680 F.2d 1360 (11th Cir. 1982).

Peck's and Conn further claim that NRC and FATI cannot establish that their reliance on the truth of the representations made by Conn was the proximate cause of their injuries. Rather, Conn argues that they were negligent in researching the chain of title to the Birmingham Property in that their researcher documented a mortgage which did not exist and failed to identify a mortgage constituting a valid lien on the property. Conn concludes that it was the failure of NRC and FATI's title researcher that proximately caused their injuries, not reasonable reliance on the misrepresentations made in the affidavit and satisfaction.

## V. Court's Conclusions

After drafting the foregoing, the court conducted a recorded phone conference with the parties on January 21, 1999. As indicated during said conference, the court concludes that FATI did not reasonably rely upon the affidavit of Conn in determining that there was no outstanding mortgage to First Bank. FATI or its agent initiated the problem by misreading the recorded mortgage. The examiner simply assumed, since the first two named entities in the recorded mortgage were Peck's and San-Ann Tobacco, Inc., that San-Ann was the mortgagee. The recorded instrument makes it clear, however, that First Bank was the mortgagee.

The referenced mistake made by FATI's agent led to the resulting fiasco. It cannot be said that FATI reasonably relied upon what was caused by its own mistake.[4] The court notes that the affidavit signed by Conn does not specifically say that the subject mortgage is a mortgage to San Ann Tobacco, Inc. or that it was only to said San Ann Tobacco. Since San Ann Tobacco, Inc. gave a mortgage to the bank on behalf of Peck's,

---

[4] It is likely that it only relied upon its own search of title and that the affidavit and satisfaction were merely in furtherance of its mistake. The sequence of events is consistent with what Conn says she was told concerning the title search.

Peck's arguably incurred some sort of indebtedness (indirect or otherwise) to San Ann Tobacco, Inc. in consideration of its having mortgaged its property. Be that as it may, the affidavit clearly states where the mortgage is recorded. Even if FATI initially had not known where the mortgage was recorded, it was told. It knew of the mortgage because it had issued a title commitment. It was not reasonable for a title insurance company to rely totally on an affidavit when it knew and was told of the location of the mortgage.[5] It seems apparent that FATI was relying upon its own title check and was simply attempting to get a release based upon its own examination. It was doubly unreasonable for it to not even look at the mortgage when it was clearly told where it was recorded. Conn's affidavit does not say that there was not a mortgage to the bank.

On March 11, 1997, FATI issued a title commitment which stated that there was a mortgage from Peck's Petroleum, Inc. to San Ann Tobacco, Inc. recorded at Real 3541, Page 970. Conn's affidavit is dated April 9, 1997. FATI did not reasonably rely on Conn's affidavit in issuing its title commitment. It simply misread the mortgage.

As indicated in Foremost Ins. Co. v. Parham, 693 So.2d 409 (1997), in considering reasonable reliance, the court should consider the sophistication of the parties. Further, Foremost states:

> [T]he representee's reliance must be reasonable under the circumstances; and, where a party has reason to doubt the truth of the representation or is informed of the truth before he acts, he has no right to act thereon. . . We reaffirm the principle of the law of fraud that knowledge of such facts which ought to excite inquiry and which, if pursued, would lead to knowledge of other facts, operates as a notice of these other facts.

693 So.2d at 419 (quoting Hickox v. Stover, 551 So.2d 259 (Ala. 1989)).

> The present standard of "justifiable reliance" requires . . . the party receiving the reperesentation . . . to be alert to statements that are patently false.

693 So.2d at 420 (quoting Harris v. M&S Toyota, Inc., 575 So.2d 74 (Ala. 1991)).

> As Foremost correctly points out, the plaintiffs received documents when they purchased their mobile homes (most of which they signed) or shortly thereafter that if read or even briefly skimmed would have put reasonable persons on notice that, contrary to Banks's representation, they had paid for their first year's coverage and that they had also purchased adjacent structures coverage.

693 So.2d at 421. See Foremost for other pertinent statements with regard to reasonable reliance. Also see McGriff v. Minnesota Mut. Life Ins. Co., 127 F.3d 1410 (11th Cir. 1997), where the court stated:

---

[5] It would be interesting to know if the title insurance business, in general, reasonably relies on sellers' affidavits as opposed to independent title examinations. Does it so advertise?

>We begin our analysis by noting that there has been considerable debate in the Alabama courts as to the proper application of the "reliance" element in fraud cases. Initially, Alabama courts applied a "reasonable reliance" standard to both consumer and commercial transactions, holding that "if a ... plaintiff, acting as a reasonably prudent person exercising ordinary care, would have discovered the 'true facts' before acting on the alleged misrepresentation, then, as a matter of law, the plaintiff could not have relied on the misrepresentation."

127 F.3d at 1414 (quoting Johnson v. State Farm Ins. Co., 587 So.2d 974 (Ala. 1991).

>The "justifiable reliance" standard governed in Alabama until recently, when the Alabama Supreme Court overruled Hickox and returned to the "reasonable reliance" standard set out in Torres.

Id. See other pertinent statements in McGriff.

Dillard's affidavit states, "But for the affidavit of Conn, First American Title Insurance Company would not have issued the title insurance policy that gave rise to First American Title Insurance Company's liability in the case." The documents signed by Conn are the same type of documents as would have ordinarily been presented to Conn if the mortgage had been to San Ann Tobacco, Inc. It is obvious that FATI had relied upon its own title check before issuing its commitment. The affidavit and release were to satisfy the condition it had listed.[6]

The court has read the cases cited in FATI's letter of January 28, 1999. Not only are the cases not controlling, they are distinguishable. Perhaps the closest case to that here is Parker v. Title & Trust Co., 233 F.2d 505 (9th Cir, 1956). There, however, the ruling was premised substantially on contract law. Here, there was no contract between Peck's or Conn and FATI. Parker might have had some application between FATI and NRC, but there is no such claim made by FATI. Further, Parker states, "Hence information that lot 2 was owned by the United States was not available from any records within Hood River Courts during the year 1951." Id. The element of reasonable reliance is as essential to a fraud action as any other element. No reasonable juror could find that FATI, which had conducted a title search and had located the subject mortgage, relied upon Conn's affidavit, reasonably or otherwise. What is more likely is that Conn executed the affidavit based upon FATI's title search and the closing attorney(s)' request.

The court having so determined, the parties agree (see recorded discussion) that there is to be no further claim by or against NRC and/or Young. Conn and Peck's further acknowledge that they have no claim against

---

[6] Another interesting point is this. Apparently, at the time of the January 12, 1989 mortgage, the title to the property was in San Ann Tobacco, Inc. It would be interesting to know why the title examiner thought that San Ann Tobacco, Inc. had received a mortgage on property which it owned.

any party. The result is that FATI is entitled to recover $ 237,391.95 against Peck's, said amount being agreed upon by FATI and Peck's.

Done this 3rd day of February, 1999.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE